Joseph E. THOMAS, Plaintiff,

v.

Ruth A. MARTIN (Hogan), Defendant.

Civ. No. 2923.

United States District Court
E. D. Virginia,
Norfolk Division.

Nov. 27, 1961.

Taylor, Gustin, Harris & Furniss, Norfolk, Va., for plaintiff.

Kramer & Stackhouse, Norfolk, Va., for defendant.

DALTON, District Judge, Sitting by Designation.

Joseph E. Thomas sued Ruth A. Martin (now Hogan) and Betty J. Brannock for

personal injuries allegedly received on January 24, 1959, when he was struck by an automobile, owned by Brannock and driven by Miss Martin, while crossing Bellinger Boulevard, near the Naval Air Station, Norfolk, Virginia. Betty J. Brannock was subsequently dismissed as a defendant and the case was tried before a jury, resulting in a verdict in favor of Thomas against Ruth A. Martin Hogan in the sum of $40,000.00.

At the trial the facts disclosed that on January 24, 1959, at about 11:30 in the evening, an automobile owned by Betty J. Brannock and operated by Ruth A. Martin struck and injured a pedestrian, Joseph Thomas, crossing Bellinger Boulevard, near the Naval Air Station, Norfolk, Virginia. Miss Martin was an enlisted person in the Waves, and stationed at the Naval Air Station and was returning to her barracks driving east on Bellinger Boulevard when the accident occurred. Mr. Thomas was a sailor, about thirty-three years old, also returning to his quarters, walking west on the north side of Bellinger Boulevard.

Bellinger Boulevard has two lanes of traffic going in each direction, with space approximating two additional lanes on the south side of the boulevard, apparently for parking and leading onto the apron and taxi strip to the hangars and buildings in that vicinity. On the north side of the boulevard are taxi ways leading off the boulevard in a northwesterly direction to other buildings in the vicinity.

Because there was a sidewalk on the south side of Bellinger Boulevard, and because a railroad track and hedge row on the north side made walking any further on that side impractical, Mr. Thomas attempted to cross Bellinger Boulevard to the south side of the street. He was struck by the car driven by Miss Martin somewhere in the approximate vicinity of the double white line dividing the eastbound and west-bound lanes of traffic.

Mrs. Hogan, the defendant, testified that she was traveling in an easterly direction in the right-hand or curb side lane of Bellinger Boulevard, in the vicinity of what is known as the hangar area, that she came to a blinking caution light, slowed her speed from about 30 to 25 miles per hour, and because of a steam pit in the street, switched over into the left lane, next to the double dividing line; that after she got into the left lane, she saw a man, approximately fifty feet away standing on the double center line, as if waiting for her to pass. She testified that she watched him and as she got within less than a car length from him, he lunged out in front of the vehicle. She could not say whether he tripped or fell.

Mr. Thomas, the plaintiff, testified that he was walking on the north side of the boulevard, crossed one taxi way, came to an island between the taxi ways, and started to cross the boulevard to the south side. He said he observed a car approximately a block away, about six hundred feet, coming towards him in an easterly direction; that he watched this car and continued walking until he reached the center or double dividing lines.

He said he reached the center line, stopped to observe traffic, and that the car appeared to be two hundred to two hundred fifty feet away, in the lane next to the center line; that he continued across the street, across the broken white line, which is the center line of the eastbound traffic, and that when he reached this point the car appeared about fifty feet away and it was veering to the right and he stopped because he didn't know which way the car was going to go, and at this moment he was hit by the left front bumper and fender.

He testified that he had been drinking slightly, having two or three beers at a tavern in a period of about three hours before departing the tavern at about 11:00 P.M., some thirty minutes prior to the accident.

Immediately following the accident, the plaintiff was picked up by an ambulance from the Naval Station and was taken to the dispensary at the Naval Air Station, and given medications for pain, and a splint was applied to his right leg and thigh. At the dispensary he was attended by Dr. R. R. Schwartz, who testified

at the trial as to Thomas' condition at the time.

Out of the presence of the jury, Dr. Schwartz testified that he had ordered a Bogen test, or blood test analysis, on both Thomas and Martin and that the result of the test on Thomas showed "Three milligrams per cc of alcohol." This Court refused to admit the results of this Bogen test. Dr. Schwartz was permitted to describe to the jury Thomas' mannerisms, speech, and physical condition at the time of examination, all suggesting that Thomas might have been drinking moderately to heavily.

Raymond W. Harrison, an investigator for the Security Department, Naval Air Station, investigated the accident and testified that at an earlier criminal hearing Mrs. Hogan (Martin) had stated that she couldn't see to drive without glasses, and that she had lost her pair in Florida, apparently prior to the accident.

Defendant moved for a directed verdict at the completion of the plaintiff's evidence and again at the conclusion of all the evidence. The Court submitted the case to the jury, keeping the two motions under advisement. Defendant further objected to the granting of certain instructions offered by the plaintiff, as well as the refusal to grant certain instructions offered by the defendant.

Upon the return of the jury verdict in favor of the plaintiff in the amount of $40,000.00, defendant moved to set aside the verdict as being contrary to the law and evidence and that a new trial be granted. He also renewed his motion for a directed verdict.

A transcript of the record having been prepared and counsel for both the plaintiff and defendant having submitted briefs in support of their views, this Court now must rule upon these motions of the defendant.

Defendant in his brief submits five grounds to support the above described motions:

(1) Plaintiff was not entitled to rely on the last clear chance doctrine, and giving instruction on this doctrine was erroneous;

(2) The result of the Bogen test should have been presented to the jury;

(3) The doctor should have been permitted to state his opinion that the plaintiff was drunk;

(4) The instruction on "right-of-way" of plaintiff was erroneous; and

(5) The instruction on sudden emergency should not have been given.

Defendant asserts that the plaintiff was not entitled to rely on the last clear chance doctrine and that a final judgment in her favor should be entered on that ground. Defendant asserts in the alternative that the other errors as charged entitle her to a new trial.

### I. Last Clear Chance Doctrine

In Greear v. Noland Company, 197 Va. 233, 89 S.E.2d 49, 53 (1955), the Supreme Court of Appeals of Virginia pointed out the two situations where the doctrine of last chance has application:

(1) The helpless plaintiff:

"Where the injured person has negligently placed himself in a situation of peril from which he is physically unable to remove himself, the defendant is liable if he saw, or should have seen, him in time to avert the accident by using reasonable care."

(2) The inattentive plaintiff:

"Where the plaintiff has negligently placed himself in a situation of peril from which he is physically able to remove himself, but is unconscious of his peril, the defendant is liable only if he saw the plaintiff and realized, or ought to have realized, his peril in time to avert the accident by using reasonable care."

From the evidence it is clear that plaintiff cannot avail himself of the first situation. Plaintiff was not physically unable to remove himself from the situa-

tion of peril wherein he negligently placed himself.

The second situation, the inattentive plaintiff, is the one which plaintiff sought to bring himself within; and the Court so instructed the jury on the rules applicable to the inattentive plaintiff. Defendant objected to the giving of this instruction on the ground that plaintiff was not entitled to rely on the last clear chance doctrine.

It is the opinion of this Court that plaintiff was entitled to the foregoing instruction because the evidence as presented left reasonable inferences that a jury could have found favorable to the plaintiff. There was evidence from which the jury might find that the defendant did actually see plaintiff in time to avert the accident, but subsequently failed to use reasonable care to prevent injuring him. There was evidence that plaintiff was unconscious of his peril. When a person is observed standing in the center of a four-lane heavily traveled boulevard, it is reasonable to believe that that person is in some degree of peril or danger. These were all matters for jury determination under proper instruction. Nicholson v. Stroup, 249 F.2d 874 (4th Cir. 1957).

It must be remembered that this was not the only instruction given to the jury. They were also instructed on the contributory negligence of the plaintiff:

> "The Court instructs the jury that even though you may believe from the evidence that the defendant was guilty of negligence which was a proximate cause of the collision, nevertheless if you further believe from the evidence that the plaintiff also was guilty of negligence proximately contributing to the cause of the collision, then your verdict must be for the defendant.

> "The law does not undertake to apportion or balance negligence of the parties where both are at fault in order to ascertain which one is most at fault, but the plaintiff is barred from recovery if he was guilty of any negligence which proximately or efficiently contributed to the collision."

This case is not one where it can be said, as a matter of law, that under the stated principles of the doctrine as listed in Greear v. Noland Company, it has no application here. All these matters were properly for the jury to determine.

## II. Admissibility of Blood Test Under Federal Business Records Act

■ The evidence was quite clear from the testimony on the record that the defendant failed to establish every link in the chain of identification between the taking and analysis of the Bogen test of blood for alcoholic content. The doctor, Schwartz, testified himself that he was not completely familiar with the types of chemicals added to the blood sample and that he was not present when the chemicals were actually added to the blood sample. The doctor's testimony further left the possibility that several persons had been involved—one technician might have withdrawn the blood, while another prepared the chemicals for a determination by Dr. Schwartz.

This Court reached the conclusion that the evidence of this test was inadmissible under the very widely followed rule that the party offering the evidence had failed to establish every necessary link in the chain of identification of the evidence. Novak v. District of Columbia, 82 U.S. App.D.C. 95, 160 F.2d 588 (1947).

■ Defendant urges that the evidence should have been admitted under the Federal Business Records Act, 28 U.S.C.A. § 1732(a), sometimes referred to as the Federal Shop Book Rule:

> "In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course

of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind."

It seems clear that the purpose of the Act was to provide for the admission of records of transactions without having to produce the person who made the entries. The Act did not provide for admission of evidence which was otherwise inadmissible; it provided for a better, more feasible method of admitting evidence which was otherwise admissible:

"Federal 'Shopbook' Rule does not render admissible any evidence that was not previously admissible. Its only effect is to eliminate the necessity of producing the person who made the record, in order to make it admissible." 2 Barron and Holtzoff, Federal Practice and Procedure § 971.

The record of the test was kept as a routing record. There is no doubt that medical records of this type are within the purview of this Federal Business Records Act. New York Life Insurance Co. v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297 (1945); Wheeler v. United States, 93 U.S.App.D.C. 159, 211 F.2d 19 (1953).

Dean Wigmore in his Treatise on Evidence relates the history of this act and similar state statutes and discusses the reason for this exception to the hearsay rule (Wigmore, Evidence §§ 1522–1527 (3d Ed. 1940)). It can readily be seen that one of the primary reasons for admitting such records kept in the ordinary course of business is their apparent trustworthiness. The trustworthiness lies in the fact that they are routine reflections of the day-to-day operations of the business. Palmer v. Hoffman, 318 U.S. 109, 113, 63 S.Ct. 477, 87 L.Ed. 645 (1943); Standard Oil Company of California v. Moore, 251 F.2d 188 (9th Cir. 1957). But where a witness testifies to the manner in which the test was taken and raises doubt as to the trustworthiness of the record, the reason for the rule disappears. (See United States v. Ware, 247 F.2d 698 (7th Cir. 1957).

Kissinger v. Frankhouser, 194 F.Supp. 276 (E.D.Va.1961), on appeal to the Court of Appeals, Fourth Circuit, is urged upon this Court by the defendant as controlling on the cause at issue. It appears to this Court that the opinion of Judge Hoffman in Kissinger v. Frankhouser is a sound and correct decision, with truly outstanding analysis on this problem of the application of the Federal Business Records Act to the Bogen test for alcohol content in blood. His conclusions in that case strengthen the conclusion of the Court in this case that here the test results are inadmissible.

In Kissinger the hospital mate who took the blood from the person testified as to the procedure he followed in withdrawing the blood. He stated his qualifications for performing this task. Judge Hoffman found this hospital mate, Gibson, thoroughly qualified to draw the blood and prepare the containers for evaluation by a physician. The hospital record was then introduced into evidence, signed by the physician who apparently had evaluated the test, to show the results of that test. Gibson testified as to the qualifications of the doctor who evaluated the test, and testified that he was with the doctor when this particular test was evaluated.

Judge Hoffman, finding the blood test admissible, made an observation fully in accord with the view of this Court: "As an exception to the hearsay rule, the final test of admissibility depends upon necessity and circumstantial guaranty of trustworthiness." The procedure approved by Judge Hoffman is quite different from that followed in the case at hand.

In this case, the doctor who evaluated the test was brought in to testify. He could not identify the person who drew the blood from the plaintiff, nor could he identify the person who prepared the chemicals which were added to the blood. The qualifications of these unknown persons could only be assumed. These circumstances clearly distinguish this case from the Kissinger case.

Cases cited by defendant, primarily Wheeler v. United States, 93 U.S.App.D. C. 159, 211 F.2d 19 (1954), indicates that other federal courts have treated this problem of trustworthiness as one of materiality rather than admissibility:

"Any objections which appellant might have to Dr. Mangum's or Bacteriologist Stone's lack of personal knowledge of any of the steps from preparation of the slides to their production in court do not affect their admissibility but go, instead, to the weight to be accorded them."

This Court does not believe that this blood test was admissible under the Federal Records Act, but assuming that this evidence should have been admitted into evidence for the jury to determine the weight to be accorded it, this Court is still of the opinion that failure to admit such evidence is not sufficient grounds for granting a new trial.

Under the circumstances of the subsequent questioning by counsel for defendant of the witness, Dr. Schwartz, about the events surrounding his treatment of the plaintiff, and his description of the plaintiff at the time of treatments, all in the presence of the jury, no substantial rights of the parties were affected. The direct questioning of Dr. Schwartz brought out substantially what defendant had sought to prove by the excluded evidence—the possibility that the plaintiff had been drinking at the time of the accident.

### III. Right of Way

The Virginia Code § 46.1–231 enumerates clearly the rights of pedestrians·

"(a) The driver of any vehicle upon a highway within a business or residence district shall yield the right of way to a pedestrian crossing such highway within any clearly marked crosswalk or any regular pedestrian crossing included in the prolongation of the lateral boundary lines of the adjacent sidewalk at the end of a block, except at intersections where the movement of traffic is being regulated by traffic officers or traffic direction devices.

"(b) No pedestrian shall enter or cross an intersection in disregard of approaching traffic.

"(c) The drivers of vehicles entering, crossing or turning at intersections shall change their course, slow down or come to a complete stop if necessary to permit pedestrians to cross such intersections safely and expeditiously.

"(d) Pedestrians crossing highways or streets at intersections shall at all times have the right of way over vehicles making turns into the highways or streets being crossed by the pedestrians." See generally, Wong v. Terminal Cars, Inc., 201 Va. 564, 111 S.E.2d 799 (1960).

There was evidence in this case that the plaintiff was crossing at some type of an intersection, where pedestrians would normally be expected to cross. He testified that he crossed at a caution light, and that he thought there was a crosswalk marked there. Other witnesses testified and photographs showed that there was a caution light in that vicinity. Photographs introduced into evidence did show a solid white line drawn across the two west-bound lanes in the vicinity of the caution light. There were two taxi strips which entered the boulevard in the vicinity of the caution light and island at which the plaintiff crossed and where the pedestrian crossing was marked across the two west-bound lanes.

Photographs and witnesses showed that there was a pedestrian crossing at a caution light at the other, or western-

most, entrance of the intersection where the boulevard widened out.

In fact, photographs showed that the white lines designating the traffic lanes were discontinued from the pedestrian crossing at the western-most entrance to the solid white pedestrian crossing line in the west-bound lanes at the eastern-most entrance, indicating that this area in between was an intersection.

With this evidence present, it was for the jury to determine if this were an intersection which was a normal place for a pedestrian to cross and whether or not this plaintiff had crossed in this intersection in such a manner to receive advantage of having the right of way.

In trying to relay to the jury the respective rights of the parties, as set forth in the Virginia Code, in the simplest, yet clearest language possible, this Court gave the following instruction:

> "The Court tells the jury that the pedestrian has the right of way at an intersection, if you believe he was crossing at an intersection, and this right of way extends from the moment he steps into the intersection, and if he was then in the exercise of ordinary care on his part, that right of way extends from that time from one side of the street to the other and all vehicles intending to pass through the intersection must give the pedestrian the right of way and allow him to pass from one side of the street to the other in safety."

To which the following instruction was added:

> "If you should believe that the plaintiff was not crossing at an intersection, then the pedestrian must exercise a higher degree of care than if crossing at an intersection."

These two instructions taken together fairly presented the applicable law relative to the facts which had been disclosed from the evidence.

## IV. Opinion Testimony

Defendant further objects to the Court's refusal to allow Dr. Schwartz to state his opinion that the plaintiff was drunk. The record at page 183 discloses that the witness was allowed to say that the plaintiff was drinking from moderately to heavily:

> "Q  Now, Doctor, you say, from his symptoms, that you gather he was drinking from moderately to heavily. I think that's—
>
> "A  Yes."

Furthermore, the doctor was allowed to describe in detail the plaintiff's symptoms at the time of treatment. These facts concerning the plaintiff's condition were sufficient for the jury to draw their own inferences as to his sobriety or lack of sobriety at the time of treatment. 7 Wigmore, Evidence, §§ 1917–1925 (3d Ed. 1940).

## V. Sudden Emergency

Whether a plaintiff is entitled to relief under the sudden emergency doctrine or entitled to an instruction on the doctrine are two completely different matters. The evidence which had been presented was such that a jury might possibly have believed that the plaintiff had acted under a sudden emergency. Plaintiff and defendant alike were entitled to have the jury instructed as to the proper application of this doctrine. It was within the discretion of the Court to instruct on this doctrine, and the instruction as given was proper under current Virginia law. Lindberg v. Goode, 200 Va. 784, 108 S.E.2d 364 (1959).

## Conclusion

For the reasons as set forth above, the defendant's motion for a directed verdict in her favor is denied, and her motion for a new trial is likewise denied, and an order will be entered approving the jury verdict and granting judgment thereon.